Filed: May 16, 2001

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

_____

No. 00-2159
(CA-99-1880-A)

_____

Joan H. Cox, etc.,

                                        Plaintiff - Appellant,

        versus

County of Prince William, et al.,

                                        Defendants - Appellees.

_____

O R D E R

_____

    The court amends its opinion filed May 4, 2001, as follows:

    On page 8, first full paragraph, line 2 -- the phrase "as he lie sleeping" is corrected to read "as he lay sleeping."

                                For the Court - By Direction

                                /s/ Patricia S. Connor
                                        Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JOAN H. COX, Individually, and as
Widow and Personal Representative
of the Estate of Brian J. Cox,
Deceased; and as Mother and Legal
Guardian of Brian Justin-Tyler Cox,
a minor,
Plaintiff-Appellant,

v.

COUNTY OF PRINCE WILLIAM; CHARLIE
T. DEANE, Individually and as Chief,
Prince William County Police
Department; JAMES FORD,
Individually and in his Official

Capacity as a Police Officer; MARK                          No. 00-2159
J. HARMAN, Individually and in his
Official Capacity; ROBERT C. SHAUL,
Individually and in his Official
Capacity,
Defendants-Appellees,

and

PRINCE WILLIAM COUNTY SHERIFF'S
DEPARTMENT; PRINCE WILLIAM
COUNTY POLICE DEPARTMENT; MARK
HAMILL, Individually and in his
Official Capacity as a Police
Officer; JOHN DOES 1-10,

Supervisors and Trainers at the
Prince William County Police
Department; JOHN DOES, 11-20,
Individually and in their Official
Capacities as Police Officers in the
Prince William County Police
Department,
<u>Defendants.</u>

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Chief District Judge.
(CA-99-1880-A)

Argued: March 1, 2001

Decided: May 4, 2001

Before KING and GREGORY, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

_____

Affirmed by published opinion. Judge Gregory wrote the opinion, in
which Judge King and Senior Judge Hamilton joined.

_____

**COUNSEL**

**ARGUED:** Patrick Michael Regan, REGAN, HALPERIN & LONG,
P.L.L.C., Washington, D.C., for Appellant. Sharon Elizabeth Pandak,
OFFICE OF THE COUNTY ATTORNEY, Prince William, Virginia,
for Appellees. **ON BRIEF:** Thanos Basdekis, REGAN, HALPERIN
& LONG, P.L.L.C., Washington, D.C., for Appellant. Gifford R.
Hampshire, OFFICE OF THE COUNTY ATTORNEY, Prince William, Virginia, for Appellees.

_____

**OPINION**

GREGORY, Circuit Judge:

Joan Cox, individually and as widow and personal representative of the Estate of Brian J. Cox, and as mother and legal guardian of Brian Justin-Tyler Cox, a minor ("Appellant"), appeals the district court's order granting summary judgment to the Appellees on her claims of excessive force pursuant to 42 U.S.C.A. § 1983 (West Supp. 2000) and assault, battery, and wrongful death under Virginia law. In response to a neighbor's report that a burglary may have taken place at the Cox residence, the police searched the residence and discovered a man (later identified as Brian Cox) asleep in one of the bedrooms. After Cox awoke, pointed a previously concealed rifle at the officers, and failed to drop the weapon as ordered, the officers shot and killed Cox. Because we find that the officers' use of force was reasonable under the circumstances, we affirm the district court's order.*

I.

On December 12, 1997, the Appellant and her husband, Brian Cox had an argument after driving home from a party. After Cox struck the Appellant, she left with the keys and drove to a friend's house. Locked out, Cox proceeded to break into his home by breaking a rear window. Cox, who was intoxicated at the time, went straight to bed, taking a rifle to bed with him. The Appellant speculates that the rifle was for protection in light of the broken back window.

At approximately midnight, Adam Conrath, the Cox's next door neighbor, telephoned the Prince William County police to report that his wife had heard the sound of breaking glass at the Cox residence.

_____

* Because we affirm the district court's order on the ground that the officers' use of deadly force did not violate the Fourth Amendment and decline to reach the issue of qualified immunity, we need not address the issue of whether the test for qualified immunity and the reasonableness test under the Fourth Amendment merge for purposes of our analysis. See Saucier v. Katz, ___ U.S. ___, 121 S. Ct. 480 (2000) (granting certiorari on, inter alia, the issue of whether the reasonableness inquiry merges when analyzing qualified immunity in an excessive force claim).

Conrath stated that a light inside the residence had then been turned off and that he saw that a window in the rear of the house had been pushed up. Conrath further reported that there was no car in the Cox driveway, which was unusual for that time of night.

The police dispatcher sent out an alert over the radio for a suspected burglary in progress. Officers Mark J. Harman and Nathan J. Jones responded to the call, arriving at approximately 12:05 a.m. Harman went to the front of the residence, a unit in a row of townhouses, and Jones approached from the back. At the back of the residence, Jones observed that the Venetian blind to one of the second level windows was disturbed or broken with a screen missing. Jones spoke or motioned to someone standing at the window of the Conrath residence and inquired whether anyone had exited the window; he received a negative response. Meanwhile, Officers Sandra J. Conlon and Stephen C. Mercer arrived on the scene. Conlon joined Jones at the rear of the residence and Mercer went to the front where Harman was stationed.

While waiting for a canine unit to arrive, Harman went back to his squad car and telephoned Communications and the Conrath residence in an attempt to obtain additional information about the residence, including the names of the residents. Although Harman attempted to obtain a telephone number for the residence, using both the address and the name Brian Cox, Communications was unable to locate the number.

Officer James Ford arrived with a police canine at approximately 12:30 a.m. Officers Harman and Jones climbed through the broken window in the rear of the residence and proceeded directly and quickly through the front door, leaving it open behind them. Before entering the residence to conduct a search with the canine, Jones and Ford noticed what they took to be broken automobile glass on the driveway of the Cox residence. Ford then stood at the entrance and shouted three identical loud announcements into the residence with pauses between them: "Police canine. Speak to me now or I'll turn the dog loose!" After one of these announcements, Ford thought he heard movement inside the residence, but Harman believed the movement came from the Conrath residence next door. The warnings were heard by the Conraths from inside their townhouse and by a neighbor 100

4

yards away who came out to his front porch after hearing the warnings. Cox, however, did not respond to these announcements. Ford entered the Cox residence with his canine on lead, accompanied by Harman and Jones.

Jones stationed himself at the top of the staircase to the basement. After searching the main level, Harman followed Ford and his canine upstairs. Near the top of the stairs, Harman saw a man (later identified as Cox) lying on a bed in a room across the hallway from the stairs. Cox did not respond to additional police announcements made at the top of the stairs. The officers entered his bedroom with Ford maintaining the canine on lead. Both of the officers were dressed in uniform with identifying badges and markings.

Inside the bedroom, Ford and his canine remained at the foot of the bed, while Harman took up a position at the right side of the bed near the foot. According to the officers, Cox was lying on his left side with his left arm underneath him and his right arm extended in front of him with at least one of his hands concealed by the bedcovers. He was lying across the length of the bed, about three-quarters down from the head, on a slight diagonal, with his eyes closed, facing towards the bedroom door. Cox was wearing a white t-shirt and boxer shorts and remained motionless.

Ford testified that he yelled out "hey" in another attempt to get Cox to respond. After Cox failed to respond, Ford and Harman switched places -- with Ford and the canine assuming a position at the right side of the bed. The canine was reportedly barking ferociously approximately one and a half feet from Cox's head. The officers testified that Harman slowly and methodically reached out to touch or tap the bottom of Cox's foot in a continued attempt to rouse him. The Appellant, however, claims that Harman struck the top of Cox's left foot with a blunt object such as his flashlight, hard enough to leave a bruise.

Harman testified that he was studying the colored tattoo on Cox's right leg at this time when his attention was diverted by the sound of Ford yelling at Cox to put his hands up. Cox brought a rifle up from underneath the covers, pointing it in the direction of Ford and yelling "AHHHHHH." Ford removed his service weapon from its holster and

5

started shooting at Cox. Harman, who already had his weapon drawn, also started shooting because he thought Cox was going to kill Ford. At least one of the shots went through Cox's right wrist, splitting the wooden stock of the rifle as he held it in a firing position. Jones came up the stairs and moved the rifle away from Cox's reach. Although the officers immediately called for an ambulance, the rescue crew determined that Cox was dead upon arrival.

The Appellant filed a complaint in the district court, alleging excessive force pursuant to § 1983 and assault, battery, and wrongful death under Virginia law. She named Prince William County, Police Chief Charlie T. Deane, Lt. Robert C. Shaul (the supervising officer on the scene), Ford, and Harman ("Appellees") as defendants. Finding that the officers were justified in their use of deadly force, the district court granted summary judgment to the Appellees and dismissed the case.

II.

We review a district court's grant of summary judgment de novo. Higgins v. E. I. DuPont de Nemours & Co., 863 F.2d 1162, 1167 (4th Cir. 1988). Summary judgment is appropriate only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A material fact is in dispute when its existence or non-existence could lead a jury to different outcomes. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue exists when there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party. Id. Mere speculation by the non-moving party cannot create a genuine issue of material fact. Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). In reviewing a grant of summary judgment, we view the evidence in the light most favorable to the non-moving party. Smith v. Virginia Commonwealth Univ., 84 F.3d 672, 675 (4th Cir. 1996) (en banc).

A.

We first address whether the officers' use of deadly force was justified under the circumstances. The constitutional right at issue in this case involves the Fourth Amendment's prohibition against unreason-

6

able seizures. The Supreme Court has held that "all claims that law enforcement officers have used excessive force -- deadly or not -- in the course of an arrest, investigatory stop, or other `seizure' of a free citizen should be analyzed under the Fourth Amendment and its `reasonableness' standard." Graham v. Connor, 490 U.S. 386, 395 (1989).

In assessing an excessive force claim under the Fourth Amendment, we apply an objective reasonableness standard: "the question is whether the officers' actions are `objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397. "A police officer may use deadly force when the officer has sound reason to believe that a suspect poses a threat of serious physical harm to the officer or others." Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996) (citing Tennessee v. Garner, 471 U.S. 1 (1985)). A reviewing court must keep in mind that "police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving." Graham, 490 U.S. at 397. We must therefore judge reasonableness from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 396.

In the case before us, the officers were investigating a suspected burglary in progress. They came across Cox while searching the residence and attempted to rouse him to ascertain his identity. It is undisputed that Cox unexpectedly sat up and pointed a concealed rifle at Ford. Ford immediately yelled something to the effect of "get your hands up, police." Harman confirmed that Ford gave Cox this verbal warning before they started shooting. Officers Jones, Conlon, and Mercer also heard the warning from where they were stationed. Although Conrath and his wife had retreated to the farthest corner away from the common wall between the residences, Conrath corroborates the officers' testimony by stating that they heard muffled yelling and then gunshots in rapid succession. It is undisputed that Cox failed to respond to this verbal warning. Further, based on the injuries to Cox's wrist, forearm, hip, and thigh on his right side as well as the damage to the rifle, First Sergeant Robert Zinn determined that Cox was "holding the rifle in a manner capable of being fired effectively." We believe that the officers had sound reason to believe that Cox posed a threat of serious physical harm.

7

B.

The Appellant, however, claims that Harman aggressively struck Cox's foot as he lay sleeping, an action that amounted to an unconstitutional use of excessive force as well as a violation of nationally accepted police procedures. The Appellant further claims that Cox's subsequent death was a foreseeable result of this alleged constitutional violation. Accordingly, she contends that the officers' actions as a whole were not objectively reasonable under the Fourth Amendment.

Because there was no eyewitness testimony at the scene other than the investigating officers, the Appellant presents very little evidence in support of her claim that Harman aggressively struck Cox's foot. The Appellant's strongest evidence is the existence of a bruise on the top of Cox's left foot. Although the bruise was not noted on the autopsy report, private investigators Larry Bailey and John Hickey were present at the autopsy and photographed the bruise. The Appellant's medical expert, Jack Daniel, reviewed the photograph and testified that the rounded bluish discoloration and slight swelling on Cox's foot "is consistent with a hematoma due to blunt impact."

Although the Appellees question the very existence of such a bruise, we take the facts in the light most favorable to the Appellant and assume that Cox had a bruise on the top of his left foot for purposes of our analysis. We find, however, that there is no evidence, beyond mere speculation, to suggest that Harman caused the bruise through the application of unconstitutional excessive force. Because the Appellant "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another," Beale, 769 F.2d at 214, we find that she failed to present sufficient evidence to withstand summary judgment.

Moreover, even if Harman caused the bruise in an attempt to rouse Cox, we find that striking him on the foot under these circumstances was not an unconstitutional use of force. It is undisputed that Cox remained unresponsive even while a police canine ferociously barked less than two feet from his head. The officers had also made several loud announcements and failed to receive any response from Cox. For all the officers knew, Cox may have been sick or even dead. Faced

8

with this situation, we simply cannot conclude that striking Cox on the foot to provoke a reaction was unreasonable under the circumstances.

C.

We therefore conclude that the officers' use of deadly force in response to an immediate and serious threat to their safety was reasonable under the standard set forth in Graham v. Connor. Upon waking Cox, it is undisputed that he rose from the covers and pointed a rifle directly at Officer Ford. "The Fourth Amendment does not require police officers to wait until a suspect shoots to confirm that a serious threat of harm exists." Elliott, 99 F.3d at 643. Accordingly, we find that the officers' use of force was justified under the circumstances presented in this case. Because we find that there was no underlying constitutional violation, we find it unnecessary to reach the issue of qualified immunity.

III.

Because the officers did not commit any constitutional violation in using deadly force against Cox, we also find that the district court correctly granted summary judgment and dismissed the Appellant's claims against Lt. Shaul, Police Chief Deane, and Prince William County. "In the absence of any underlying use of excessive force, . . . liability cannot be placed on either the non-shooting officers, a supervisor, or the City." Hinkle v. City of Clarksburg, 81 F.3d 416, 420 (4th Cir. 1996).

IV.

For the foregoing reasons, we affirm the order of the district court.

AFFIRMED

9